UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
SANDRAN WARAN,                                  :
                                                :
            Plaintiff,                     :
                                                :     16cv1386
          -against-                          :
                                                :     <u>OPINION & ORDER</u>
CHRISTIE'S INC.,                                :
                                                :
            Defendant.                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, Senior United States District Judge:

        Sandran Waran ("Waran") brings this diversity action for fraud against Christie's Inc. ("Christie's") in connection with Christie's sale of two Asian antiquities. Christie's moves for summary judgment, claiming that Waran fails to establish a misstatement, scienter, or damages. Christie's also asserts that Waran's claim is time-barred. For the reasons that follow, Christie's motion for summary judgment is granted, and this action is dismissed.

## BACKGROUND

        In March 2005, Waran purchased a sculpture titled "Blackstone Stele of Vishnu on Garuda" (the "Blackstone Stele") for $40,704 at auction from Christie's. (Affirmation of R. Zachary Gelber, Esq. in Opposition to Defendant's Motion for Summary Judgment, ECF No. 78 ("Gelber Affirm."), Ex. 4 ("Blackstone Invoice").) In its March 2005 Indian and Southeast Asian Art Catalog, Christie's represented that the Blackstone Stele was created in twelfth century northeastern India, and that its provenance was "of a Boston Collection," which had "[a]cquired [it] in 1993." (Gelber Affirm., Ex. 3 ("2005 Catalog"), at 37.) Before Waran's purchase, Christie's policy was to accept information regarding provenance from consignors at face value.

(Defendant's Response to Plaintiff's Counter-Statement Pursuant to Local Civil Rule 56.1, ECF No. 91 ("Def.'s Response"), ¶¶ 32A, 38A; see also Gelber Affirm., Ex. 2 ("Robinson Dep."), at 12:23–13:3 (providing that "a verbal response was generally sufficient unless it flagged anything that caused worry"); Robinson Dep., at 40:18–25.)

Sometime around March 2005, Christie's began implementing a stricter policy for authentication. (See Affidavit of Sandra L. Cobden, Esq. in Support of Christie's Motion for Summary Judgment, ECF Nos. 66, 69, and 70 ("Cobden Aff."), Ex. 3.) Christie's started requiring consignors to provide a signed "Provenance and Country of Origin Declaration" form, or "PCOO." (Cobden Aff., Ex. 4 ("Christie's Interrogatory Responses"), at 3.) The PCOO required a consignor to certify "that the property left its source country prior to the earlier of: (i) January 1, 2000, (ii) the date of an applicable bilateral agreement restriction between the United States and the source country, or (iii) the date the source country went into conflict or war." (Christie's Interrogatory Responses, at 3.) "Consignors were also asked to provide any and all available supporting documentation . . . ." (Christie's Interrogatory Responses, at 3.)

Christie's did not obtain a PCOO from the consignor of the Blackstone Stele. (Gelber Affirm., Ex. 1 ("Cobden Dep."), at 71:13–19; 82:14–83:7.) Waran contends that the PCOO policy was in place at the time he purchased the Blackstone Stele. In an interrogatory response, Christie's stated that the PCOO policy began in 2005. (Christie's Interrogatory Responses, at 3.) In its statement of material facts, Christie's clarifies that it established the PCOO requirement in March 2005, and that it had acquired the Blackstone Stele prior to that time. (See Def.'s Response ¶ 38A.)

In March 2007, Waran purchased a sculpture titled "Sandstone Figure of Uma"

2

(the "Sandstone Figure," and together with the Blackstone Stele, the "Works") for $70,620 at auction from Christie's. (Gelber Affirm. Ex. 7 ("Sandstone Invoice"); Def.'s Response ¶ 29.) In its March 2007 Indian and Southeast Asian Art Catalog, Christie's represented that the Sandstone Figure was created in eleventh century Khmer,[1] and that its provenance was "of a private English collection, before 1975." (Gelber Affirm. Ex. 8 ("2007 Catalog").) Christie's obtained a PCOO from the consignor of this sculpture in December 2006. (Cobden Aff., Ex. 5 ("Sandstone PCOO").) The PCOO certified that the Sandstone Figure had been located in "Surrey, UK, before 1962." (Sandstone PCOO.)

In 2012, Christie's amended its provenance policy. "[I]n addition to the PCOO form," consignors were required to submit "verifiable documentation to substantiate" the representations in the PCOO. (Christie's Interrogatory Responses, at 5; Cobden Dep., at 194:8–13; see also Gelber Affirm., Ex. 17.) Verifiable documentation could include receipts, invoices, inheritance documents, insurance listings, photographs, letters, "or any other source that the clients can provide above and beyond their own testimony." (Christie's Interrogatory Responses, at 5–6.)

In mid-2013, Waran began discussions with Christie's regarding consigning 24 works in his collection for auction. (Cobden Aff., Ex. 7, at 4–5; Gelber Affirm., Ex. 19.) In January 2014, Waran delivered those works to Christie's. (Cobden Aff., Ex. 8, at 1–2.) In February 2014, Christie's informed Waran that due to a lack of provenance verification, Christie's was unable to offer eight of his works in its March 2014 auction. (Cobden Aff., Ex.

---

[1] "The Khmer empire was the largest continuous empire of South East Asia, based in what is now Cambodia." *Khmer Empire*, NEW WORLD ENCYCLOPEDIA (May 18, 2008, at 8:59 PM), http://www.newworldencyclopedia.org/entry/Khmer_Empire.

11, at 6.) Christie's assured Waran that it would continue to investigate each of those works with a view to including them in a future auction. (Cobden Aff., Ex. 11, at 6.) Waran questioned Christie's inability to authenticate works that it had sold to him. (Cobden Aff., Ex. 11, at 5–6.) Christie's explained that since Waran's purchases, "the market for Indian antiquities ha[d] come under greater scrutiny," causing its "Legal Department [to] instill[] new requirements for substantiation of provenance prior to sale." (Cobden Aff., Ex. 11, at 4.)

As part of its investigation, Christie's reached out to the Works' consignors, seeking the documentation required under its more rigorous policy. (See Cobden Aff., Exs. 9 & 10.) Neither consignor could fulfill this request. The Sandstone Figure's consignor reported that his "uncle and aunt who might have [the] information passed away some years ago." (Cobden Aff., Ex. 9, at 2.) The Blackstone Stele's consignor had "no memory of [the] sculpture," and believed that it had been sold by "someone else." [2] (Cobden Aff., Ex. 10, at *2.) More than a year later, Christie's followed up with both consignors, but still could not obtain additional documentation. (Gelber Affirm., Ex. 22, at 1; Cobden Aff., Ex. 9, at 1.)

Simultaneously, executives within Christie's debated whether the firm could make an exception to its stricter provenance policy because Waran had purchased the works from Christie's. (Cobden Aff., Ex. 13, at 2.) Ultimately, Christie's determined that it could not make an exception for the Sandstone Figure and Blackstone Stele. (Cobden Aff., Ex. 15, at 1–3.) Christie's resolved the provenance issues for all of Waran's consigned works except for those two. (See Cobden Aff., Ex. 16, at 2; March 2, 2018 Hearing Transcript, ECF No. 109 ("Mar.

---

[2] Specifically, in two emails, the Blackstone Stele's consigner stated: (1) "I don't remember this sculpture. . . Maybe I have some memory loss (I'm serious)"; and (2) "I would certainly help if I could – but I have no memory of this sculpture. It was probably someone else. Please send me a record of the consignment that bears my name. 99.99% this is not mine. I hope I don't have memory loss. I'm serious." (Cobden Aff., Ex. 10, at *2, *6.)

4

Hr'g Tr."), at 2:22–23.)[3]

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Davis v. Blige, 505 F.3d 90, 97 (2d Cir. 2007). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

"The party against whom summary judgment is sought . . . must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis original) (citation, quotation marks, and alterations omitted). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

---

[3] In connection with its summary judgment motion, Christie's submits an Expert Report by James McAndrew. (See Cobden Aff., Ex. 2 (the "Report").) Waran argues that this Court should strike this Report based on Christie's failure to comply with Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 702. Ultimately, the Report's utility in determining this motion is de minimis, and this Court need not consider it.

DISCUSSION

"To prove a claim of fraud under New York law a plaintiff must show, by clear and convincing evidence . . . that the defendant made a material misrepresentation of fact, knowing of its falsity and with the intent to induce reliance, and that the plaintiff justifiably relied on that misrepresentation to her detriment . . . ." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 491 (2d Cir. 2014); see also Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007). "At the summary judgment stage, a party must proffer enough proof to allow a reasonable jury to find by clear and convincing evidence the existence of each of the elements necessary to make out a claim for fraud in the inducement." Woo v. Times Enter., Inc., 2000 WL 297114, at *4 (S.D.N.Y. Mar. 22, 2000) (citation and quotation marks omitted).

"Clear and convincing proof is highly probable and leaves no substantial doubt." Dongguk Univ. v. Yale Univ., 734 F.3d 113, 123 (2d Cir. 2013). "The clear and convincing evidence standard demands a high order of proof and forbids the awarding of relief whenever the evidence is loose, equivocal, or contradictory because fraud will not be assumed on doubtful evidence or circumstances of mere suspicion." Hindsight Solutions, LLC v. Citigroup Inc., 53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014) (citation and quotation marks omitted).

In reviewing the evidence in a light most favorable to Waran, this Court concludes that Waran fails to establish two elements of his claim: (1) that there was a misstatement, and (2) that Christie's acted with scienter. Accordingly, this Court need not reach Defendant's other arguments.

I.   Misstatement

Fraud requires a misstatement.  See Sado v. Ellis, 882 F. Supp. 1401, 1406 (S.D.N.Y. 1995); Lovett v. Allstate Ins. Co., 446 N.Y.S.2d 65, 67 (N.Y. App. Div. 1982) ("In proving an allegation of fraud, an essential element is that the representation must have been false when it was made."); 60A N.Y. Jur. 2d Fraud & Deceit § 120 (2018) ("It is fundamental in the law of fraud that in order for a representation to furnish the basis for relief, it must be false."). Waran has the burden to establish that the provenance guarantees were false, and this showing must be unequivocal.  See Altman v. Casale, 270 N.Y.S.2d 509, 510 (N.Y. App. Div. 1966) ("Fraud is established only where facts are provided from which it results as an unavoidable inference.")

To be clear, Christie's never determined that its guarantees of provenance were false or inaccurate.  Nor did Christie's contradict its earlier representations.  (See Mar. Hr'g Tr. at 4:20–25.)  Rather, Christie's informed Waran that because its internal procedures had tightened, the Works no longer had sufficient documentation.  (See Cobden Aff., Ex. 11, at 1 (informing Waran that Christie's continues to "stand behind the works [it] sells," but had "instilled new requirements for substantiation of provenance prior to sale" meaning "in a few instances, works sold by Christie's years before no longer comply with [its] vetting practices").

Waran's attempt to proffer evidence that the catalogs' descriptions of provenance were false is insufficient.  All he points to is that the Works' consignors could not provide additional documentation to Christie's.  While the failure by the consignor of the Blackstone Stele to remember selling that piece is troubling, it falls short of clear and convincing evidence that the provenance was false.  "The evidence of fraud must be clear and convincing and any

7

inference of fraud must be unequivocal." Miller v. Grigoli, 712 F. Supp. 1087, 1095 (S.D.N.Y. 1989) (citations and quotation marks omitted); see also The Sample Inc. v. Pendleton Woolen Mills, Inc., 704 F. Supp. 498, 506 (S.D.N.Y. 1989) (dismissing fraud claim that "failed to show that the representation [made by defendant] was false at the time it was made").

While Waran contends that Christie's fails to prove its assurances of provenance were legitimate, this overlooks that it is ultimately his burden to prove the opposite—that the assurances were false. See In re Trico Marine Servs., 382 B.R. 201, 210 (S.D.N.Y. 2008) (holding that whether statements were intentionally misleading or made with reckless indifference, appellant failed to demonstrate that they "were in fact untrue").

Nothing in the record demonstrates that the Blackstone Stele and Sandstone Figure were not the antiquities that Christie's represented them to be. Rather, Waran's evidence is "loose, equivocal, or contradictory." Hindsight Solutions, 53 F. Supp. 3d at 772; see also The Sample, 704 F. Supp. at 506 (holding plaintiff's evidence "hardly constitute[d] clear and convincing evidence that would allow a reasonable jury to decide that the representation was false"); Van Alen v. Dominick & Dominick, Inc., 441 F. Supp. 389, 403 (S.D.N.Y. 1976) ("[I]t is clear that plaintiff has not proven common law fraud by clear and convincing evidence. It is not possible to draw an 'unequivocal' inference from the facts as recited above."). His failure to establish a misstatement defeats his claim. See Sado, 882 F. Supp. at 1406 ("Failure to prove a triable issue of false representation is dispositive . . . .").

II. Scienter

"[C]ommon law fraud . . . require[s] the [p]laintiff to plead scienter." Saltz v. First Frontier, LP, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010). "The standard for evaluating

8

whether [a] plaintiff[] ha[s] presented sufficient evidence of scienter is the same under New York common law as it is under Section 10(b) of the Securities Exchange Act of 1934 . . . ." King Cty., Wash. v. IKB Deutsche Industriebank AG, 916 F. Supp. 2d 442, 447 (S.D.N.Y. 2013). Other than showing intent to deceive or knowledge of falsity, a plaintiff may establish scienter by showing a defendant acted recklessly. See De Sole v. Knoedler Gallery, LLC, 139 F. Supp. 3d 618, 641 (S.D.N.Y. 2015).

As scienter is generally a question of fact, "[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999). But summary judgment is nevertheless appropriate "where a plaintiff has failed to make a showing of wrongful intent on the part of defendant sufficient for a reasonable jury to find for plaintiff on that issue." Lawford v. N.Y. Life Ins. Co., 739 F. Supp. 906, 913 (S.D.N.Y. 1990).

Waran does not contend that Christie's intentionally or knowingly misled him. Instead, he argues that its due diligence before guaranteeing provenance was so deficient as to constitute recklessness. "A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud . . . ." Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 46 n.13 (2d Cir. 1978).

While Waran may have an argument that Christie's should have done more, that amounts to negligence, not recklessness. "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Rolf, 570 F.2d at 47 (citation omitted) (emphasis

9

added). There is no indication that the consignors' provenance information raised any red flags that Christie's should have but failed to notice.

Further, Waran offers no evidence Christie's practices were so deficient that they constitute "an extreme departure from the standards of ordinary care." See Rolf, 570 F.2d at 47 (citation omitted). Importantly, Christie's head of Group World Art explained that it was Christie's practice to request more information if it "flagged anything that caused worry." (Robinson Dep., at 12:23–13:3; see also Cobden Dep., at 173:14–16 ("[T]his is what the departments do, is they talk to the consignor and understand from the consignor the story . . . .").) Waran provides nothing showing this course of conduct was less than the industry standard.[4]

Waran contends that the due diligence Christie's conducted was "so flimsy as to lead to the conclusion that there was no genuine belief in its truth." See State St. Trust Co. v. Ernst, 15 N.E.2d 416, 419 (N.Y. 1938). In making this argument, Waran mainly relies on Rolf. There, the Second Circuit held that a broker committed fraud by reassuring his client that trades were lawful "without investigation and with utter disregard for whether there was a basis for the assertions." Rolf, 570 F.2d at 47–48. Waran asserts that Christie's engaged in the same "heedlessness and reckless disregard of consequences" by parroting the consignors' representations without further investigation. See Rolf, 570 F.2d at 46 n.13.

But Rolf arose in the context of a fiduciary relationship. See S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 114 (2d Cir. 2009). And in Rolf, the broker "actively lulled the investor by expressing confidence in the advisor without bothering to investigate

---

[4] In September 2017, this Court held that Waran failed to designate an expert within the time permitted under this Court's Scheduling Order. (See September 14, 2017 Hearing Transcript, ECF No. 62, at 20–21.)

whether these assurances were well-founded." See Rolf v. Blyth Eastman Dillon & Co., Inc., 1978 WL 4098, at *1 (2d Cir. May 22, 1978) (per curiam).

Notably, no fiduciary relationship existed between Waran and Christie's. And Christie's did not "actively lull" Waran "by expressing confidence in [the consignors]." See Rolf, 1978 WL 4098, at *1. Moreover, the Second Circuit has explained that the recklessness required for fraud is akin to "defendants' knowledge of facts or access to information contradicting their public statements." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) ("[R]ecklessness must in fact approximate an actual intent to aid in the fraud being perpetrated[.]" (citation omitted)). Finally, in Rolf, the broker made assurances without any basis. See Rolf, 570 F.2d at 48. In contrast, Christie's had a general policy to obtain whatever information was available, and while it certainly could have done more, its failure does not amount to recklessness.

Waran's reliance on Eaves v. Designs for Finance, 785 F. Supp. 2d 229, 253 (S.D.N.Y. 2011) is also misplaced. First, Eaves was at the motion to dismiss stage. And on the merits, the Eaves court held the plaintiffs' fraud claims were actionable because the defendant "did not actually believe its opinions when it communicated them." Eaves, 785 F. Supp. 2d at 253. Waran does not contend, nor does the evidence show, that Christie's did not believe the pieces' provenance to be legitimate before representing that they were.

Edward Tyler Nahem Fine Art, LLC v. Barral, 24 N.Y.S.3d 634 (N.Y. App. Div. 2016) is more on point for a fraud claim regarding artwork. There, the First Department affirmed the dismissal of a claim regarding "representations as to good title of . . . artwork [that] all proved to be false." Edward Tyler Nahem Fine Art, 24 N.Y.S.3d at 635. The First

11

Department held that even though the defendant's representations were false, "[t]he evidence d[id] not show that defendant had reason to doubt the veracity of its representation [and] failed to investigate before making it . . . ." Edward Tyler Nahem Fine Art, 24 N.Y.S.3d at 635. Like Edward Tyler Nahem Fine Art, nothing in this record demonstrates that Christie's doubted the veracity of its representations but failed to investigate. See In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (holding that plaintiff's evidence "may raise an inference that [defendant] was negligent in not following up on [] discussions, but it certainly d[id] not show the conscious turning away from the true facts required for recklessness" (emphasis added)).

## CONCLUSION

Undoubtedly, Waran thought he made a prudent investment when he acquired antiquities from a reputable auction house. But what occurred here, although unfortunate and unfair, does not constitute fraud. For the foregoing reasons, Christie's motion for summary judgment is granted and this case is dismissed. The Clerk of Court is directed to terminate all pending motions and to mark this case as closed.

Dated: May 31, 2018
    New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.